# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 23-1367V**

| | |
|---|---|
| LEAH KELLER,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: October 9, 2026 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Alexa Roggenkamp, U.S. Department of Justice, Washington, DC, for Respondent.*

**DECISION AWARDING DAMAGES**[1]

On August 18, 2023, Leah Keller filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza ("flu") vaccine administered on October 20, 2021. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree on the amount of compensation.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages of **$**250,000.00 for actual pain and suffering**.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I. Relevant Procedural History

Although Respondent conceded that Petitioner was entitled to compensation, the parties reached an impasse after attempting to resolve damages. ECF No. 32. Petitioner filed a motion for a ruling on the record with regard to damages on December 1, 2025. Petitioner's Motion for Ruling on the Record Regarding Damages ("Mot."), ECF No. 34. Respondent filed a response on January 14, 2026. Respondent's Response to Petitioner's Motion for Ruling on the Record Regarding Damages ("Resp."), ECF No. 36. Petitioner filed a reply on February 13, 2016. Petitioner's Reply to Respondent's Response to Petitioner's Motion for Ruling on the Record Regarding Damages ("Reply"), ECF No. 37. I subsequently proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issues. That hearing was held on September 25, 2026,[3] and the case is now ripe for a written determination.

## II. Relevant Facts

Petitioner received a flu vaccine in her left arm on October 20, 2021. Ex. 1. Two days later (October 22, 2021), Petitioner complained of left shoulder pain, rating it as four to five out of ten. Ex. 3 at 9-10. She was diagnosed with subacromial bursitis and prescribed a Medrol pack for relief. *Id.* at 10. Petitioner again complained of left arm pain on October 28, 2021, to orthopedist Dr. Jesse Allert. Ex. 6 at 3. She described feeling immediate sharp pain at the time of her vaccination and exhibited reduced range of motion. *Id.* at 3-4.

Petitioner had an MRI on November 2, 2021, which showed mild joint arthrosis, tendinopathy, a labral tear, and small joint effusion. Ex. 13 at 3. Thereafter, between November 9, 2021, and February 23, 2022, Petitioner attended nine physical therapy sessions. Ex. 2 at 4-28. During that time her pain was rated as five out of ten at worst. Ex. 2 at 26. Petitioner continued to treat during this period. On December 9, 2021, she reported increasing pain radiating to her fingers and had a steroid injection. Ex. 6 at 5. She also underwent an EMG and saw a neurologist for ongoing symptoms. Ex. 12 at 8; Ex. 5 at 4.

Petitioner returned to physical therapy and attended 62 additional sessions between May 2022 and March 2023. Ex. 8 at 5-68; Ex. 11. During this period, Petitioner showed improvement but continued to experience discomfort. On July 5, 2022, she reported her pain as six to seven out of ten at times and received a second steroid

[3] At the end of the hearing, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

injection. Ex. 6 at 8. A third steroid injection was administered on October 5, 2022. Ex. 10 at 6.

Following the steroid injections, Petitioner was treated for chronic central serous chorioretinopathy ("CCSC") by Dr. Larisa Kayserman beginning in March of 2023. Ex. 21 at 61. Dr. Kayserman noted that Petitioner's condition "could be related to steroid injections in the shoulder/arm, since steroids are well known to contribute to Central Serous Retinopathy." *Id.* at 62.

On March 23, 2023, Petitioner returned to Dr. Allert for left shoulder pain. Ex. 10 at 8. She reported that she "developed a black spot" in her vision and was diagnosed with CCSC and now had difficulty driving at night. *Id.* She also agreed to diagnostic arthroscopy with a potential "debridement of the capsule." *Id.* This procedure occurred on March 29, 2023. *Id.* at 10-11. Her surgeon noted "multiple sources for pain, some of which [were] neurologic in origin and other of which [were] musculoskeletal", and that the surgery might not relieve all of her pain. *Id.* at 11.

Following surgery, Petitioner attended 56 additional physical therapy sessions. Ex. 18 at 5-191. Her pain was reported as five to six out of ten. *Id.* During this time she also suffered recurrent CCSC symptoms in June of 2023. Ex. 21 at 44. She was seen by Dr. Harvey Rosenblum at Rosenblum Eye Centers for an independent medical examination on July 20, 2023. Dr. Rosenblum "concluded that the development of serous retinopathy in this case is casually related to the shoulder injection." Ex. 22 at 7-8. Thereafter Petitioner experienced recurrent CCSC symptoms with stress. Ex. 21 at 19.

After initial improvement, Petitioner's pain returned in August of 2023. Ex. 17 at 15. A second MRI on December 14, 2023, showed sprains, small effusions, mild bursitis, continued tendinopathy, and a labrum tear. Ex. 17 at 29. Petitioner had 18 physical therapy sessions between August 1 and September 29, 2020. Ex. 9 at 302-429. During her post-operative orthopedic appointments, Petitioner reported pain between four and seven out of ten. Ex. 2 at 91, 97, 118.

Petitioner was seen again for shoulder pain on January 24 and February 29, 2024. She rated her pain as four to eight out of ten, and was unable to take corticosteroids due to her past CCSC. Ex. 25 at 555.

Petitioner underwent a second arthroscopic surgery on April 3, 2024, again performed by Dr. Allert. Ex. 17 at 6. At a post-operative examination, Petitioner continued to described discomfort. Ex. 25 at 644. Dr. Allert stated that he did not "believe there is anything else surgical that I can provide", and that he was "uncertain that she will ever return to 'normal.'" *Id.* Thereafter she attended thirty physical therapy sessions between

April 23 and September 9, 2024. Ex. 17 at 21-22. Her pain was initially rated as seven out of ten at worst. *Id.* During this period Petitioner also sought care for pain management with Dr. Adam Kenny, and was prescribed pregabalin, methocarbamol, and naproxen. Ex. 19 at 22. Dr. Kenney "discussed injections with [petitioner]," but "with her history of retinopathy [petitioner] does not want any other steroid based injections." Id.

In September 2024 Petitioner was seen for a workers' compensation claim. Ex. 25 at 979. She rated her pain as six to seven out of ten when typing, which she described as encompassing 50-75% of her day. *Id.* at 981.

Petitioner continued to see a pain management specialist from August 2024 through November 2025. Ex. 23 at 8-14; Ex. 27; Ex. 28. During this period, her pain was described as one to seven out of ten, however it was rated as high as six to eight out of ten in November of 2025.

Petitioner provided an affidavit with her damages brief on December 1, 2025. Ex. 29. Petitioner states that she had pain immediately and now requires chronic pain management. *Id*. at 1. She also described how her injury continue to affect her daily life. *Id.* at 1-3. Further, the chronic pain and physical limitations forced her to "step away from [her] full-time, 18-year career as a nurse and, mostly, nurse practitioner in inpatient acute-care and oncology medicine." *Id.* at 3. Petitioner stated that "caring for cancer patients gave my professional and personal life true meaning and importance. Having to give that up has been a tremendous emotional loss." *Id.*

## III. The Parties' Arguments

Petitioner seeks an award of $250,000.00 for pain and suffering – the full amount permitted under the Vaccine Act. In her brief and argument, Petitioner highlighted her high levels of pain, two surgeries, cortisone injections, over 150 physical therapy sessions, development and recurrence of CCSC, and how her injury forced her to step back from direct care as an oncology nurse. Mot. at 18-24. Respondent contends a pain and suffering award of $175,000.00 is appropriate here. Resp. at 10.

## IV. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury,

and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior pain and suffering awards to aid in determining the appropriate amount of compensation for pain and suffering in a case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

Vaccine Program. *Id*. at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## V. Prior SIRVA Compensation Within SPU[5]

### A. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, 4,545 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,397), with the remaining 148 cases dismissed.

2,506 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[6] In only 270 of these cases, however, was the amount of damages determined by a special master in a reasoned decision.[7] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[8]

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] The remaining 1,891 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as “litigative risk” settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,206 cases) or stipulation (30 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[8] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless “provide *some* evidence of the kinds of awards received overall in comparable cases.” *Sakovits v. Sec’y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

| | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[9] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *270* | *2,206* | *30* | *1,891* |
| **Lowest** | $30,000.00 | $5,000.00 | $45,000.00 | $1,500.00 |
| **1st Quartile** | $67,305.16 | $60,000.00 | $90,000.00 | $32,500.00 |
| **Median** | **$89,500.00** | **$80,000.00** | **$122,866.42** | **$50,000.00** |
| **3rd Quartile** | $125,000.00 | $107,987.07 | $162,000.60 | $75,000.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 270 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $30,000.00 to $215,000.00, with $87,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[10] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[11]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed

---

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[11] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy (“PT”). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VI. Appropriate Compensation in this Case

When determining the appropriate amount of compensation for a petitioner’s pain and suffering, I review the entire record, including all filed medical records and affidavits and all assertions made by the parties in written documents and during oral argument. I also consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

There is no dispute that Petitioner was aware of her injury, treatment, and experiences throughout the course of her injury. The records reflect that Petitioner suffered a severe SIRVA injury requiring significant treatment, including but not limited to two surgeries, over 150 physical therapy treatments, and three cortisone injections over a period of approximately four years. She reported moderate to severe pain through most of her treatment. Petitioner suffered from other conditions including CCSC which was casually linked to her SIRVA treatment and required pain management specialists to manage her symptoms. Finally, Petitioner continued to have SIRVA symptoms at the end of her treatment. Additionally, due to her injury and treatment, Petitioner was forced to switch careers, resulting in significant emotional distress.

The cases that Respondent proposes as comparable differ from the circumstances

in Petitioner's case in several significant ways.[12] All three involved at least two surgeries, and awarded between $173,000 and $185,000 for pain and suffering. However the injured in those cases did not treat for as long or extensively. Further, Respondent's cases do not involve the complications suffered by Ms. Keller – in particular the development of CCSC. This record strongly supports the conclusion that this condition was a secondary consequence of treatment for Petitioner's SIRVA.

I find the comparable damages cases awarding over $200,000 helpful in providing a reasonable range of outcomes pertaining to the instant case. For example, *Mulloy* and *Lawson* both awarded $205,000 for pain and suffering. *Lawson v. Sec'y of Health & Hum. Servs.*, No. 18-882V, 2021 WL 688560 (Fed. Cl. Jan. 5, 2021); *Mulloy v. Sec'y of Health & Hum. Servs.*, No. 19-1396V, 2023 WL 2620653, at *1 (Fed. Cl. Mar. 24, 2023). In *Lawson*, the petitioner's injury lasted for more than four years, she had three surgeries, seven steroid injections, four rounds of physical therapy, and plasma injections. *Lawson*, 2021 WL 688560. In *Mulloy*, the petitioner treated for over four years, had four steroid injections, and underwent more than 100 physical therapy sessions. *Mulloy,* 2023 WL 2620653, at *1.

I also find Petitioner's circumstances resemble those in *McCarn v. Sec'y of Health & Hum. Servs.,* No. 20-1988V, 2025 WL 1891823 (Fed. Cl. Spec. Mstr. June 6, 2025) (awarding $210,000 for actual pain and suffering). In *McCarn*, the petitioner experienced other comorbid conditions (*i.e.*, axillary neuropathy), plus shoulder symptoms at the end of her treatment, and a severe treatment course overall including dozens of physical therapy sessions and two injections over four years. *id.*

Petitioner's injury course and treatment involved a severe and fairly aggressive course – resulting in sequelae more severe than other SIRVA cases. She also suffered from other ailments directly linked to her injury, specifically CCSC, that significantly impacted her sight and may periodically return. Further, Petitioner showed how her injury and treatment resulted in real-life implications affecting her personal and emotional well-being, including affecting her activities of daily living and employment.

Thus, pursuant to my oral ruling on September 25, 2026 (which is fully adopted herein), **I find that $250,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**

---

[12] Respondent cites to three cases, *Rice-Hansen v. HHS*, No. 20-1338V, 2022 WL 18339478, at *7, *10 (Fed. Cl. Spec. Mstr. Dec. 9, 2022) (awarding $175,000 for a SIRVA that involved two surgeries, 40 PT sessions, cortisone injections, and petitioner's inability to utilize certain pain relief therapies); *Edwards v. HHS*, No. 21-56V, 2023 WL 6847484 (Fed. Cl. Spec. Mstr. Sept. 11, 2023) (awarding $173,000 for a SIRVA involving two surgeries, 53 PT sessions, two MRIs and two steroid injections); and *Tappendorf v. HHS*, No. 20 1592V, 2024 WL 1299566, at *2 (Fed. Cl. Spec. Mstr. Feb. 23, 2024) (awarding $185,000 for a SIRVA involving three surgeries, 100 PT sessions).

## Conclusion

In light of all of the above, I award **Petitioner a lump sum payment of <u>$250,000.00</u> for pain and suffering to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner, <u>Leah Keller</u>.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[13]

**IT IS SO ORDERED.**

**<u>s/Brian H. Corcoran</u>**
Brian H. Corcoran
Chief Special Master

[13] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.